IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA
PHILADELPHIA DIVISION

| | |
|---|---|
| **LOS AMIGOS MARKET, INC.**, a Pennsylvania Corporation, and **LUIS NUNEZ**, An Individual, **Plaintiffs**, v. **UNITED STATES OF AMERICA**, **Defendant**. | CIVIL ACTION NO. COMPLAINT |

The Plaintiffs, LOS AMIGOS MARKET, INC., a Pennsylvania Corporation and LUIS NUNEZ, an Individual, by and through their undersigned counsel and hereby file this Complaint against the UNITED STATES OF AMERICA upon the grounds set forth herein, and in support thereof, states as follows:

**FACTUAL BACKGROUND**

1. The Plaintiff owns and operates a retail store in Philadelphia, Pennsylvania, named Los Amigos Market, Inc. (hereinafter referred to as "Los Amigos Market"). The store is comprised of a commercial storefront dedicated to retail sales of retail food market, focusing mostly on groceries to the Plaintiffs' customers.

2. Located in Pennsylvania's 2nd Congressional District, Los Amigos Market serves a community where approximately 31% of households receive Supplemental Nutrition Assistance Program benefits[1] ("SNAP"), formerly known as Food Stamps, which is overseen by the Food & Nutrition Service ("FNS") of the United States Department of

---

[1] See USDA Publication of December 2020, Profile of SNAP Households: Pennsylvania Congressional District 2.

Page **1** of **11**

Agriculture ("USDA"). Of said households, an astounding 51.5% are below the poverty level, 37.4% of said households are with one or more people 60 years of age and over, 49.8% of said households are with child(ren) under the age of 18 years, and 56.6% of said households are with disabled individual(s).

3. Accordingly, Los Amigos Market began accepting Electronic Benefit Transfers (or "EBT") to better serve the local community and increase its attractiveness to SNAP customers. These SNAP customers eventually became a substantial share of the store's total clientele, responsible for a substantial portion of the store's gross revenue on EBT alone. In addition to EBT, the SNAP clientele account for an even larger portion of the gross revenue as they conduct significant non-SNAP transactions as well for ineligible items.

4. Nevertheless, on July 10, 2017, the USDA, through the FNS, sent the Plaintiffs a Charge Letter pursuant to 7 C.F.R. §278.6, alleging a series of violations on the part of the Plaintiffs in their acceptance of SNAP benefits from participants. The transactions listed by the Defendant in the Charge Letter occurred between December 2016 and May 2017.

5. The Plaintiffs denied the allegations and defended against the Charge Letter, but on November 6, 2020, they were permanently disqualified from SNAP.

6. As a result, the store lost a considerable portion of its gross revenue (including revenue derived from SNAP) and a substantial portion of its clientele.

7. Subsequently, the Plaintiffs filed an Administrative Review as permitted by 7 C.F.R. §279, and presented arguments and evidence in support of their position. The Plaintiffs took issue not only with the disqualification process and the inaccuracy of the evidence

against them, but also with the comparative lack of direct evidence that any violations of SNAP retailer policies had occurred.

8. The Administrative Review Branch of the FNS responded to the Plaintiffs' appeal in a letter and opinion entitled Final Agency Decision, dated July 21, 2021, which was received on July 22, 2021, and attached hereto as **Exhibit "A"**.  The Plaintiffs' administrative appeal was denied.

9. This Judicial Appeal has been filed, timely, to seek the reversal of the USDA's current decision to permanently disqualify the Plaintiffs from participating as a SNAP retailer.

## JURISDICTION AND VENUE

10. The Plaintiffs bring this action based upon their disqualification from eligibility to participate in the Supplemental Nutrition Assistance Program, as codified by Congress in 7 U.S.C. §§ 2011 – 2036(c).

11. This Court has subject matter jurisdiction over the matters raised by the Plaintiffs in this case pursuant to 7 U.S.C. §2023(17), and 7 C.F.R. §279.7.  Furthermore, 28 U.S.C. §1331 gives this Court original jurisdiction over civil actions arising under the laws of the United States, for which the aforementioned statute and regulation qualify.

12. Venue is appropriate in this District pursuant to 7 C.F.R.§279.7(a), 7 U.S.C. §2023(13) and 28 U.S.C. §1391(b) as Plaintiffs' business was owned and operated in Philadelphia, Pennsylvania, and because the facts giving rise the circumstances herein occurred in the Eastern District of Pennsylvania.

## PARTIES

13. The Plaintiff, LOS AMIGOS MARKET, INC., operates at 1034 Foulkrod St., Philadelphia, PA 19124-2943.  Los Amigos Market, Inc. is referred to herein as "Los

Amigos Market" and referred to herein collectively with the other Plaintiffs as "Plaintiffs".

14. The Plaintiff, LUIS NUNEZ, an individual, is a natural person, and the registered owner of Los Amigos Market, and is referred to herein collectively with the other Plaintiffs as "Plaintiffs".

15. The Defendant, the UNITED STATES OF AMERICA, acting through its agency, the United States Department of Agriculture (hereinafter referred to as the "USDA" or "Department"), and its subservice, the Food and Nutrition Service. The Defendant may be referred to herein as "the Government" or "the Department".

## GENERAL ALLEGATIONS

16. SNAP is a government program operated pursuant to Title 7 United States Code, Chapter 51, and codified more specifically as 7 U.S.C. §§2011-2036(c).

17. The general purpose of SNAP is to provide food benefits (formerly "food stamps") to program participants who meet certain financial need requirements. SNAP participants are awarded benefits (money) issued on a state-by-state basis in varying amounts based upon the needs of their household. These benefits are transmitted to, and utilized by the participant, through an Electronic Benefits Transfer (EBT) card, which conceptually functions similar to a debit card.

18. The benefits are to be used by the participant only for the purchase of food and other eligible items sold by approved SNAP retailer, such as Los Amigos Market.

19. In turn, SNAP retailers are governed by the Defendant through 7 C.F.R. §278.6 which in pertinent part permits the disqualification or suspension of retailers who violate SNAP regulations.

20. Significantly, SNAP violations on the part of retailers typically occur in two areas: (1) the sale of ineligible items to SNAP participants (using their EBT benefits), and (2) trafficking in SNAP benefits.

21. The term "trafficking" is defined at length by 7 C.F.R. §271.2, which states in pertinent part that trafficking is:

> "(1) The buying, selling, stealing, or otherwise effecting an exchange of SNAP benefits issued and accessed via Electronic Benefit Transfer (EBT) cards, card numbers and personal identification numbers (PINs), or by manual voucher and signature, for cash or consideration other than eligible food, either directly, indirectly, in complicity or collusion with others, or acting alone;
>
> (2) The exchange of firearms, ammunition, explosives, or controlled substances, as defined in section 802 of title 21, United States Code, for SNAP benefits;
>
> (3) Purchasing a product with SNAP benefits that has a container requiring a return deposit with the intent of obtaining cash by discarding the product and returning the container for the deposit amount, intentionally discarding the product, and intentionally returning the container for the deposit amount;
>
> (4) Purchasing a product with SNAP benefits with the intent of obtaining cash or consideration other than eligible food by reselling the product, and subsequently intentionally reselling the product purchased with SNAP benefits in exchange for cash or consideration other than eligible food; or
>
> (5) Intentionally purchasing products originally purchased with SNAP benefits in exchange for cash or consideration other than eligible food;
>
> (6) Attempting to buy, sell, steal, or otherwise affect an exchange of SNAP benefits issued and accessed via Electronic Benefit Transfer (EBT) cards, card numbers and personal identification numbers (PINs), or by manual voucher and signatures, for cash or consideration other than eligible food, either directly, indirectly, in complicity or collusion with others, or acting alone."
>
> See 7 C.F.R. §271.2 (2016)

22. While most of 7 C.F.R. §278.6 sets forth a graduated scale for punishment of SNAP retailers for the sale of ineligible items, trafficking is treated more harshly. Specifically, if a retailer is found to be trafficking in SNAP benefits, it (more specifically, the individual(s) who applied for SNAP participation) is permanently disqualified from participation in the program and may be issued a Transfer of Ownership Civil Money Penalty (CMP) of $11,000.00 per violation.

23. In this matter the government maintains that there were two (2) violations.

24. The Transfer CMP itself is not immediately assessed against the retailer, but instead assessed at the time the retail store is sold (regardless of the period of time intervening between the permanent disqualification and the sale).

25. Such are the circumstances of this case. The Plaintiffs have been permanently disqualified by the Defendant, resulting in damage to the Plaintiffs and a potential future fine.

**ERRORS & OMISSIONS ON THE PART OF THE DEFENDANT**

26. In the instant case, the Plaintiffs did not engage in trafficking in SNAP benefits and have consistently defended against the allegations upon those grounds.

27. The Defendant lacks any direct evidence (eye-witness accounts, receipts, or the like) that trafficking occurred.

28. Instead, the Defendant based its disqualification upon data analysis, which is circumstantial by definition: evidence from which more than one logical conclusion can be reached.[2]

---

[2] This reference is drawn from *Chief Counsel Advisory*, IRS CCA 200912021, though it is perhaps the best succinct definition of the term.

29. This type of evidence leaves considerable room for misinterpretation of the data, and erroneous conclusions surrounding the nature of transactions.

30. Each of the transactions set forth in the Charge Letter were categorized and selected by the Defendant's ALERT System computer program, which identifies specific transaction types, including two of which are addressed herein:

    a. "Multiple transactions were made from individual benefit accounts in unusually short time frames"; and

    b. "Excessively Large" purchase transactions made from recipient accounts.

31. The Department does not have any statistical studies, data analysis, or supporting evidence to show that either of those categories to the SNAP violation of "trafficking." In fact, the Defendants' Rule 30(b)(6) witness on the ALERT system's purpose and capabilities, Mr. Douglas Wilson, has previously testified on multiple occasions that those transaction categories are merely suspicious, and not in-and-of-themselves, indicative of trafficking.[3]

32. Furthermore, Mr. Wilson, as the Government's Rule 30(b)(6) witness with the most knowledge of the ALERT system, indicated that the categories and transactions cannot distinguish between different SNAP violation types (such as trafficking, issuance of credit, and sale of ineligible items).

33. There is no statistically meaningful correlation between the two transaction categories and the act of "trafficking," making it inadmissible and unreliable to prove that

---

[3] Mr. Wilson's Deposition transcripts are the result of other Judicial SNAP reviews pertaining to trafficking and data analysis. The Plaintiffs will separately produce them to the Defendant, and present as necessary to this Court. However, attachment to this Complaint would be unnecessary and redundant.

trafficking occurred.

34. Despite this, cases using the ALERT system's categories are referred to FNS' Investigative Analysis Branch (IAB) for investigation and prosecution.

35. This instant matter was just such a case, referred to IAB Section Chief Mr. Michael Skaer's division for evaluation and prosecution. Mr. Skaer was the Section Chief that issued the permanent disqualification in this case.

36. This process is not an impartial one, nor is it unbiased. As a rule, every single case referred to the IAB for data analysis is charged with trafficking in SNAP benefits.

37. Of the thousands of cases handled every year, the IAB makes a finding of trafficking in nearly all (between 95% and 100% depending upon the section) of the cases. There is no impartiality in this process. It is an assembly line.

38. The Defendant, in this case did little in way of investigation to support its position that trafficking was more likely than not the cause of trafficking. Keeping in mind that the Plaintiffs never saw the unredacted Administrative Record prior to filing this suit (this is not an exhaustive list of the failures on the party of the Defendant's data analysis):

   c. The Defendant did not interview the households engaged in the transactions, despite having the ability to do so;

   d. The Defendant continued to rely upon data comparison with other stores that differ materially in business for a variety of reasons; and

   e. The Defendant did not conduct any research on household shopping and spending habits, specifically with the effect on participants' store loyalty, item selection, purchase transaction frequency and transaction sizes.

39. At the initial stages of the Administrative Decision, it is the Government's burden to

prove by a preponderance of the evidence that it is more likely than not that trafficking had occurred.[4]

40. The Government did not (and does not) have sufficient evidence to meet that burden, or to link the transactions to trafficking. For purposes of a judicial review, the burden does switch to the Plaintiff (though it has not gotten that far yet) and for purposes of this matter, the Plaintiff does bear the burden of proof.

PLAINTIFFS' ALLEGATIONS

41. The Plaintiffs do not have access to the Administrative Record. At no point in this process have the Plaintiffs been given access to the pertinent records (aside from the Charge Letter, Initial Disqualification Letter, and Final Agency Decision) relied upon by the Department in its analysis.

42. Furthermore, there have been no decisions made by Administrative Law Judges, Department Attorneys or other legal-trained individuals who could adequately weigh the evidence before the Department during the administrative process to date.

43. What little Due Process actually exist in this process is borne out only here, at the Judicial Review stage of the case.

44. The Plaintiff's transactions were bonafide purchases of food items, in exchange for SNAP benefits as the system was intended.

45. The shopping habits of SNAP participants in the store are consistent with the transactions listed, and the Plaintiffs anticipate such testimony from these households.

46. The Plaintiffs' explanations for the transaction categories, as set forth in their response to the USDA-FNS Charge Letter, and their Administrative Brief, are consistent with

---

[4] On Judicial Appeal, the burden rests with the Plaintiffs.

the actual shopping habits and trends that occur in the store.

47. In any case, the Store was not at any point in time, engaged in trafficking SNAP benefits.

## COUNT I: REQUEST FOR JUDICIAL REVIEW

48. The Plaintiffs incorporate and restate each and every paragraph set forth above as though more fully set forth herein.

49. The Plaintiffs, pursuant to 7 U.S.C. §2023 and 7 C.F.R. §279.7 have the right to, and hereby do request a *de novo* judicial review of the permanent disqualification issued by the Defendant.

50. The Plaintiffs maintain that they did not traffick in SNAP benefits and ask that the Court conduct a trial on the merits of the matter, permitting the parties to present testimony and submit evidence in support of their positions.

51. The transaction categories cited by the Defendant are the result of the Plaintiffs' regular business practices, inventory, location and the SNAP participants' shopping preferences.

52. Furthermore, the Plaintiffs qualified for the issuance of a Civil Money Penalty, but their request was errantly denied by the Defendant.

53. The Defendant's decisions to both disqualify the store and deny the issuance of a civil money penalty were both invalid and inaccurate for those reasons set forth above, as well as such further reasons as may be uncovered during the discovery phase of this matter.

54. Accordingly, the permanent disqualification of the Plaintiffs should be reversed, and the Plaintiffs should be removed from the disqualified persons/store lists maintained within the Department.

55. Furthermore, to the extent that the Plaintiffs incur attorneys' fees and court costs in conjunction with this Judicial Appeal, the Defendant should be made to pay such fees and costs.

WHEREFORE, the Plaintiffs, LOS AMIGOS MARKET, INC., a Pennsylvania Corporation and LUIS NUNEZ, an Individual, respectfully ask this Court to conduct a *de novo* review of this matter, conduct a trial upon the merits of the Plaintiffs' case, and enter Judgment reversing the permanent disqualification, as well as awarding the Plaintiffs any attorney's fees and court costs they may incur in this matter.

Dated: August 23, 2021

Respectfully submitted,
*/s/ Ejaz A. Sabir*
Ejaz A. Sabir, Esq.
Attorney ID #92147
Sabir Law Group
6454 Market St., 2nd Floor
Upper Darby, PA 19082
Telephone:   (610) 713-9000
Fax:              (610) 713-9500
Email:  Ejaz@SabirLaw.com

-and-

**METROPOLITAN LAW GROUP, PLLC**

*/s/ Andrew Z. Tapp*
ANDREW Z. TAPP, ESQ.
Florida Bar No.: 68002
*Pro Hac Vice*[5]
1971 W. Lumsden Road, #326
Brandon, Florida 33511-8820
(813) 228-0658
Andrew@Metropolitan.Legal
**COUNSEL FOR PLAINTIFFS**

---

[5] To be filed.