Exhibit "A"

**United States Department of Agriculture**



Food and Nutrition Service

Retailer and Issuance Policy And Innovation Division

Administrative Review Branch

1320 Braddock Place, Room 5042 Alexandria, VA 22314-1649

Telephone: (302) 382-8253

Fax: (844) 629-0650

monique.brooks@usda.gov

July 21, 2021

Andrew Tapp, Attorney
Metropolitan Law Group
1871 W. Lumsden Road #326
Brandon, FL 33511

RE:   Luis Nunez, Owner
      Los Amigos Market
      1034 Foulkrod Street
      Philadelphia, PA 19124

Case # C0200984

Dear Counselor:

Enclosed is the Final Agency Decision of the U.S. Department of Agriculture (USDA), Food and Nutrition Service (FNS) in response to your request for administrative review dated November 19, 2020, filed on behalf of Los Amigos Market and its owner of record Luis Nunez. Also included therein is a statement regarding relevant rights to a judicial review.

It is the decision of the USDA that there is sufficient evidence to support a finding that a permanent disqualification from participating as an authorized retailer in the Supplemental Nutrition Assistance Program (SNAP) was properly imposed against Los Amigos Market by the Retailer Operations Division of the FNS.

Sincerely,

*Monique Brooks*

Monique Brooks
Administrative Review Officer

Enclosure – Final Agency Decision

USDA is an equal opportunity provider, employer, and lender

U.S. Department of Agriculture
Food and Nutrition Service
Administrative Review Branch

**Los Amigos Market,**
**Appellant,**

V.

**Retailer Operations Division,**
**Respondent.**

Case Number: C0200984

## FINAL AGENCY DECISION

It is the decision of the USDA that the record indicates that Los Amigos Market, (hereinafter Appellant) committed violations of the Supplemental Nutrition Assistance Program (SNAP). There is sufficient evidence to support a finding that the permanent disqualification from participation as an authorized retailer in the program, as initially imposed by the Retailer Operations Division was appropriate.

### ISSUE

The issue accepted for review is whether the Retailer Operations Division took appropriate action, consistent with 7 CFR § 278.6(c) and (e)(1) in its administration of the SNAP, when it assessed a permanent disqualification against Appellant by letter dated November 6, 2020.

### AUTHORITY

7 U.S.C. § 2023 and the implementing regulations at 7 CFR § 279.1 provide that "A food retailer or wholesale food concern aggrieved by administrative action under § 278.1, § 278.6 or § 278.7 . . . may file a written request for review of the administrative action with FNS."

### CASE CHRONOLOGY

In a letter dated July 10, 2017, Retailer Operations Division charged the Appellant with trafficking, as defined in Section 271.2 of the SNAP regulations, based on a series of irregular SNAP transaction patterns that occurred during the months of December 2016 through May 2017. The letter noted that the penalty for trafficking is permanent disqualification as provided by 7 CFR § 278.6(e)(1). The letter also noted that the Appellant could request a trafficking civil money penalty (CMP) in lieu of a permanent disqualification within 10 days of receipt under the conditions specified in 7 CFR § 278.6(i).

1

The record reflects that Appellant failed to respond to the charge letter. In correspondence dated July 17, 2017, Appellant submitted a Freedom of Information Act (FOIA) request. The FOIA was processed on July 19, 2017. In correspondence dated August 21, 2017, Appellant was notified that the FOIA request had been administratively closed due to fee-related reasons. The record then reflects that Appellant received the requested documentation via correspondence dated August 23, 2017. Appellant submitted a FOIA Appeal dated November 20, 2017 and December 8, 2017 and in email correspondence dated September 8, 2020, Appellant received the final response to its appeal request of November 27, 2017 (actual date on document November 29, 2017). In a letter dated September 10, 2020, Appellant was notified that its FOIA appeal was closed and it had 10 calendar days to submit a response to the charges.

After considering Appellants failure to reply and evidence of the case, Retailer Operations Division issued a determination letter dated November 6, 2020. This letter informed ownership that they were permanently disqualified from the SNAP in accordance with Sections 278.6(c) and 278.6(e)(1) of the SNAP regulations. The letter also states that Retailer Operations considered Appellant's eligibility for a trafficking civil money penalty (CMP) according to the terms of Section 278.6(i) of the SNAP regulations. However, Retailer Operations Division determined that Appellant was not eligible for the CMP because it failed to submit sufficient evidence to demonstrate that Appellant had established and implemented an effective compliance policy and program to prevent violations of the SNAP.

In a letter dated November 19, 2020, Appellant, through counsel, appealed the Retailer Operations Division's assessment and requested an administrative review of this action. The appeal was granted.

## STANDARD OF REVIEW

In appeals of adverse actions, the Appellant bears the burden of proving by a preponderance of the evidence, that the administrative actions should be reversed. That means an Appellant has the burden of providing relevant evidence which a reasonable mind, considering the record as a whole, would accept as sufficient to support a conclusion that the matter asserted is more likely to be true than not true.

## CONTROLLING LAW

The controlling statute in this matter is contained in the Food & Nutrition Act of 2008, as amended, 7 U.S.C. § 2021 and 278 of Title 7 of the Code of Federal Regulations (CFR). Part 278.6(a) (c) and (e)(1)(i) establish the authority upon which a permanent disqualification may be imposed against a retail food store in the event that personnel of the firm have engaged in trafficking SNAP benefits.

7 CFR § 278.6(a) states, *inter alia,* that "FNS may disqualify any authorized retail food store…from further participation in the program if the firm fails to comply with the Food and Nutrition Act of 1977, as amended, or this part. Such disqualification shall result from a finding of a violation on the basis of evidence that may include facts established through on-site investigations, inconsistent redemption data, evidence obtained through a transaction report

under an *electronic benefit transfer system …" (Emphasis added)*

7 CFR § 278.6(c) reads, in part, "*Review of Evidence*. The letter of charges, the response, and any other information available to FNS shall be reviewed and considered by the appropriate FNS regional office, which shall then issue the determination. In the case of a firm subject to permanent disqualification under paragraph (e)(1)…the determination shall inform such a firm that action to permanently disqualify the firm shall be effective immediately upon the date of receipt of the notice of determination from FNS…"

7 CFR § 278.6(e)(1) reads, in part, "FNS shall disqualify a firm permanently if personnel of the firm have trafficked as defined in § 271.2." Trafficking is defined, in part, in 7 CFR § 271.2, as "the buying or selling of SNAP benefits for cash or consideration other than eligible food."

7 CFR § 271.2 states in part that, "Eligible foods mean: Any food or food product intended for human consumption except alcoholic beverages, tobacco and hot food and hot food products prepared for immediate consumption."

## SUMMARY OF THE CHARGES

The charges on review were based on an analysis of SNAP electronic benefit transfer (EBT) transactions dated during the six-month period of December 2016 through May 2017. This involved two patterns of EBT transaction characteristics indicative of trafficking:

1. Multiple transactions were made from individual benefit accounts in unusually short time frames.
2. Excessively large purchase transactions were made from recipient accounts.

The issue in this review is whether, through a preponderance of evidence, it is more likely true than not true that the questionable transactions were the result of trafficking.

## APPELLANT'S CONTENTIONS

The Appellant, through counsel, made the following summarized contentions in its response to the permanent disqualification letter issued by Retailer Operations Division, and its request for administrative review, in relevant part:

1. Submitted are affidavits from 17 of the store's SNAP customers, stating that they spend between $25 to $200 at the store during a single trip exhausting between 5 percent to 100 percent of their SNAP benefits at the store and the majority attesting to frequenting the store multiple times in a single day.
2. The store's inventory was virtually maxed out. The store carried a huge variety of staple food items, in considerable variety and stock depth. There's simply no legitimate argument that the store didn't carry enough inventory to satisfy the transaction amounts and times.
3. Quote of past ARB Cases decision – This section is bound to those decisions made by the ARB, and accordingly, should evaluate this case under the same standards. Past

3

       Administrative Review Branch decision have identified a number of certain explanations which adequately explain the presence of Scan B2 transactions. In order for a decision from this office to not be considered arbitrary, it would need to follow the established case law and precedent.

4. Attachment 1: All of these transactions are the result of the store's business practices, inventory, customer co-shopping, purchasing preferences and the habits of the SNAP clientele.
5. On a regular basis, the participants will make significant grocery purchases from the Respondents' store within 48 hours of receiving the deposit into their accounts. Almost all of the transactions set forth in Attachment 1 reflect this standard shopping habits and patterns of SNAP participants.
6. (1) different households members will shop separately using the same account to pick up different needs, and personal needs, on top of the household's list and (2) different household participants will travel to the store together to make purchases, and then separate their purchases to track what amount each party has used from their benefits account.
7. The store's inventory greatly exceeds those around it and has a greater quality and variety than your average c-store. The inventory offered by the store is of such a variety that it's reasonable to assume a household could satisfy all of their needs on a single shopping trip.
8. Transportation inconsistency is another reason why this store's transactions appear the way they do: these participants don't have their own vehicles (it's part of the SNAP participant's application requirements that they have only one vehicle at most), so trips to larger store are dependent upon rides from friends or family.
9. Attachment 2: These transactions are the result of the store's inventory, co-shopping, and/or are the normal reflections of a SNAP participant's shopping habits. These transactions are tied directly to the store's inventory and convenience. Furthermore, the only other stores nearby, don't have the inventory variety that my clients have.
10. In the event the Department determines that trafficking did occur at the store, Appellants would request that a civil money penalty "CMP" be issued against them in lieu of a permanent disqualification.

Appellant provided a copy of the November 2016 Nutrition Assistance Program Report entitled "Foods Typically Purchased By Supplemental Nutrition Assistance Program (SNAP) Households", a copy of the USDA Pennsylvania Profile of SNAP Households in 2018, a copy of a cover story by Angela Hanson entitled "Know Your Core, Protect Your Core", a copy of a September 2020 Insight Policy Research Final Report entitled "Benefit Redemption Patterns in the Supplemental Nutrition Assistance Program in Fiscal Year 2017", a copy of the 2016 U.S. Grocery Shopping Trends, 17 customer affidavits as to the percentage of SNAP benefits spent at Appellant's store, and 733 pages of receipts and invoices.

The preceding may represent a brief summary of Appellant's contentions in this matter however, in reaching a decision, full attention has been given to all contentions presented, including any not specifically recapitulated or referenced herein.

## ANALYSIS AND FINDINGS

The FNS initially authorized the business as a convenience store on September 9, 2009. The file indicates that in reaching a disqualification determination, Retailer Operations Division considered information obtained during the May 16, 2017, store visit to the business conducted by a FNS contractor to observe the nature and scope of the firm's operation, stock, and facilities. This information was then used to ascertain if there were justifiable explanations for the EBT transactions at Appellant that formed patterns indicative of trafficking. The firm review summary documented the following store size, description, and characteristics:

1. One cash register and one POS device with a small counter area partially obstructed by other smaller items available for sale. The counter area has limited space and is encased in Plexiglas.
2. Estimated to be approximately 1000 square feet with narrow aisles.
3. There were six hand baskets but no shopping carts available for customers.
4. No adding machines or optical scanners were available at checkout. No specialty registers present.
5. Store does not operate through a night window or plastic barrier with food stock behind the barrier.
6. No evidence of wholesale business such as posted prices or separate entrances for wholesale customers.
7. No unusual pricing structure such as ending most products with 00 cents and does not round transaction totals.
8. Food is not stored in an area outside of public view.
9. Store has no storage freezers or coolers and no food stored off site.
10. Store is not primarily selling one food type such as meat, poultry, dairy, seafood, fruits, baked goods, or vegetables.
11. Store does take telephone orders (deli items) but does not offer delivery
12. Highest priced eligible food items were Goya Rice ($12.99), Riceland Rice ($12.99), Goya Corn Oil ($7.99) and America's Choice Bacon Cheddar Burgers ($11.49).
13. Store stocks a significant amount of non-food items such as but not limited to paper products, household products, tobacco products, health and beauty aids, mobile phones/phone cards and cleaning products.
14. Store stocks ample amounts of dairy products, bread and cereal products, fruit and vegetable products and meat, poultry, and fish products. No fresh fruits or produce, no fresh meat or poultry. Most meats are canned, packaged, or frozen and in a precooked state.
15. There is a kitchen/prepared food area.
16. No hot foods sold for onsite consumption.
17. A deli or prepared food section. Stock is used in preparation of food.
18. No meat or seafood specials or bundles or fruit/vegetable boxes sold.

The issue for consideration is whether Retailer Operations Division has presented a convincing case that Appellant likely trafficked in SNAP benefits. Each attachment furnished with the charge letter represents the questionable and unusual patterns of SNAP transactions indicative of trafficking which were conducted at the Appellant firm during the review period. As there is

more than one pattern of irregular transactions, the case of trafficking becomes more convincing.

**Attachment 1 of the Charge Letter – Multiple transactions were made from individual benefit accounts in unusually short time frames.**

There were 23 sets of 52 SNAP transactions that met the parameters of this attachment. Multiple transactions conducted by the same household account within a set time period is a method which violating stores use to avoid the detection of single high dollar transactions that cannot be supported by the retailer's inventory and structure.

The statements made by counsel as taken from the various reports supplied during this review, though they may be the result of studies conducted on households receiving and using SNAP benefits in general, these statements do not directly or specifically explain the transactions in Appellant's store as cited in the charge letter given the specific characteristics of Appellant's firm and the review period in question.

With regard to co-shopping being conducted at Appellant's store, Counsel offered no evidence to support its contention that these were legitimate transactions. Such evidence could include cash register receipts or other documentation to prove that the transactions cited in attachment 1 were legitimate purchases of eligible food. As such, family members using the same EBT card stated in the reply, while possible, was not supported by the evidence submitted nor by the Appellant's stock or store characteristics. Counsel's citation of SNAP reports does not specifically address Appellant and the shopping pattern exhibited as cited in the charge letter. General data does not provide an adequate reflection of the Appellant store as it is not data taken from the Appellant's transaction history. Moreover, if co-shopping truly impacted the Appellant, concluded by counsel, it would stand to reason that co-shopping would affect other nearby firms as well. This would manifest itself in comparable firms having similar transaction patterns. According the record, this is not the case.

When a household is certified for participation in the SNAP, if there are multiple families living in one household and every member of the household purchases, prepares, and eats food together, the benefits issued are for the entire household. However, if there are multiple individuals living under one roof, and they purchase, store, prepare, and eat separately, their benefits are issued as separate households, each with its own EBT card. Therefore, the different shopping priorities and needs of multiple generations residing under one roof are not necessarily portioned out via one single SNAP benefits account. The attorney's argument of "co-shopping" does not adequately explain the transactions as cited in the charge letter.

Appellant, through counsel contends that 17 of the store's SNAP customers, provided affidavits stating that they spend between $25 to $200 at the store during a single trip exhausting between 5 percent to 100 percent of their SNAP benefits at the store and the majority attesting to frequenting the store multiple times in a single day.

With regard to this contention and the affidavits, of the 17 customer affidavits provided, only 11 could be confirmed as SNAP recipients in the state administrative terminal. Five (5) of the 11 affidavits were from SNAP recipients who had no transactions at Appellant's store during the

review period and are therefore not considered. The remaining six (6) affidavits were reviewed and it was found that one affidavit contained two different handwritings and color of ink which indicates that someone other than the recipient filled in part of the form. The record reflects that although this household claims to spend 100 percent of its SNAP benefits at Appellant's store, they also shopped at eight (8) other larger authorized retailers within a 3-mile radius of Appellant during the review period.

The second affidavit indicates that Appellant is the only local place where they can purchase food when needed however a review of the address show that the household does not appear to live near Appellant's store. Though this household claimed to spend up to $100 and 60 percent of its SNAP benefits at Appellant's store, the transaction history shows that the highest amount spent at Appellant was $33.50 and that during the review period they shopped at 17 other authorized retailers within a 3-mile radius of Appellant's store including superstores.

The third affidavit indicates that the household spends up to $100 and 50 percent of their benefits at Appellant's store. The transaction history shows that the largest amount spent during the review period was $37.40 and that the household also shopped at nine (9) other authorized retailers within a 3-mile radius of Appellant's store including superstores.

The fourth affidavit indicates that the household spends up to $50 in benefits at Appellant's store. Although this household appears to live near Appellant's store, the transaction history shows that there were only four (4) transactions and the largest amount spend during the review period was $7.75. This household also shopped at 40 other authorized retailers within a 3-mile radius of Appellant's store including supermarkets and superstores.

The fifth affidavit indicates that they purchase both eligible and ineligible items such as bacon and cat food. Although this household appears to live near Appellant's store it claims to spend up to $40 and 10 percent of their benefits in Appellant's store. During the review period it was determined that this household shopped at 40 other authorized retailers within a 3-mile radius of Appellant's store to include supermarkets and superstores and of the 3 transactions completed at Appellant's store the highest amount spent was $13.50.

The sixth affidavit indicates that they spend up to $30 and 100 percent of their SNAP benefits at Appellant's store. Although this household appears to live near Appellant's store, the transaction history shows that they shopped at 18 other authorized retailers within a 3-mile radius of Appellant's store including supermarkets and superstores. This household transaction history shows that of the 52 transactions completed at Appellant's store during the review period, the highest amount spent was $57.99.

Relating to the affidavits provided and the statements rendered that purport to establish that questionable transactions were legitimate and no trafficking occurred, the truth of such a statement cannot be verified as the transaction history of the six viable affidavits do not corroborate the very claims placed on the forms themselves. Customers engaging in trafficking transactions would be unlikely to admit to this behavior. On the contrary, customer statements would be expected to attest to the legitimacy of questionable transactions regardless of whether they were, in fact, legitimate and are not sufficient evidence that any of the transactions listed in

the charge letter attachments were for eligible food items only.  Even if the statements were accepted as evidence of legitimate transactions, these statements would only cover 14 of the 324 transactions/transaction sets cited in the charge letter.  These statements are not found to be compelling or more persuasive of legitimate SNAP transactions than the evidence supporting the charge of trafficking.

Appellant, through counsel, contends that on a regular basis, the participants will make significant grocery purchases from the Respondents' store within 48 hours of receiving the deposit into their accounts.  Almost all of the transactions set forth in Attachment 1 reflect this standard shopping habits and patterns of SNAP participants.  With regard to this contention, outside of the patterns quoted in the Benefit Redemptions Patterns in the Supplemental Nutrition Assistance Program Final Report (2011), which apply to a nationwide survey, Appellant, through counsel, did not provide any corroborating evidence that SNAP recipients actually expended significant amounts of their SNAP benefits on eligible food purchases in its store.  Additionally, there was nothing to evidence that the suggested transactions were actual eligible food purchases and not trafficking transactions.

In conclusion, it is therefore more likely true than not true that the irregular transactions cited in the charge letter Attachment 1 are due to trafficking in SNAP benefits.

### Attachment 2 of the Charge Letter – Excessively large purchase transactions were made from recipient accounts.

There were 301 SNAP transactions that met the parameters of this attachment.   Based on the results of the contracted store visit, the large transaction amounts are not consistent with the store's inventory of low-priced foods.  The firm does not offer food in bulk or any ethnic or specialty foods that sell for a high price.  Therefore, the substantial number of high dollar purchases calls into question the legitimacy of these transactions.  Transactions range from $32.45 to $132.30.

Appellant, through counsel, provided approximately 730 receipts/invoices for the months of December 2016 and January 2017.  Of the 730 invoices provided it was determined that approximately 413 of these invoices were either undated, outside of the review period, duplicates, did not have the store listed as the receiver of the goods or were illegible and therefore considered ineligible during this review.  An analysis of the receipts/invoices provided demonstrate that Appellant's total eligible food inventory with a 40 percent markup totaled $25,141.24.  As Appellant is WIC authorized, the total WIC redemptions were calculated at $12,909.00.  The Appellant's SNAP/WIC redemptions totaled $34,097.57 during the review period however the total eligible food inventory during the review period totaled $25,141.24 which is -$8,959.33 than its total redemptions.  It is noted that the inventory vs redemption total does not include the 20 percent adjustment normally used for cash, check, credit, and debit purchases which would increase the negative amount  It is also important to note that having sufficient inventory to cover Federal Benefit Redemptions does not imply or determine that the firm purchased sufficient inventory to cover their total eligible food sales during the review period.

The attorney notes there are a few schools within a mile radius of Appellant's store as well as a bus stop across the street.  A review of google mapping shows the bus stop to be on the opposite side of the block and another a block up the road. There does not appear to be a bus stop across the street as claimed. The schools mentioned were located and appear to be surrounded by clusters of other authorized SNAP retailers when reviewing the ALERT mapping and not in close proximity of Appellant's store.

The record reflects that during the review period there were 81 authorized retailers within one mile of Appellant's store and include small, medium, and large grocery stores, superstores, and additional convenience stores.  Retailer Operations also conducted an analysis of the shopping habits of three of the households identified in the charge letter.  This analysis concluded that these households also shopped at other area grocery stores including full-line supermarkets and superstores that offer a much larger quantity and variety of eligible food items for likely better prices either on the same day or within days of visiting Appellant's firm.  This again indicates that lack of access to other stores is not at issue.  However, despite this access to large supermarkets and superstores, these households consistently conducted much higher transactions at the Appellant firm than at better stocked supermarkets/superstores in and around the Philadelphia County area of Pennsylvania.  This is another strong trafficking indicator.

Retailer Operations Division compared the Appellant's SNAP transactions with the average convenience store in Philadelphia County, Pennsylvania.  The average transaction amount for a convenience store the County is $8.31.  The largest purchase amount at Appellant's store, during the review period, was $132.30 which is mor than 15 times higher than the average transaction amount.  This is questionable particularly when Appellant's stock does not adequately support large numbers of high dollar transactions and does not offer any fresh meat or seafood and does not carry any specialty or ethnic items in bulk that would sell at high prices.

Appellant, through counsel, contends that transportation inconsistency is another reason why this store's transactions appear the way they do: these participants don't have their own vehicles (it's part of the SNAP participant's application requirements that they have only one vehicle at most), so trips to larger store are dependent upon rides from friends or family.  With regard to this contention, though some SNAP recipients may have some issues with transportation, Appellant, through counsel, has provided no evidence that this contention is factual nor does it provide evidence beyond a preponderance that transportation inconsistencies justify the transactions as cited in the charge letter.

**ARB CASE DECISIONS**

Appellant, through counsel, quotes a number of other ARB case decisions stating "This section is bound to those decisions made by the ARB, and accordingly, should evaluate this case under the same standards.  Past Administrative Review Branch decision have identified a number of certain explanations which adequately explain the presence of Scan B2 transactions.  In order for a decision from this office to not be considered arbitrary, it would need to follow the established case law and precedent."  With regard to this contention, this administrative review is based on the specific circumstances of this case as documented by materials provided by Appellant and

the Office of Retailer Operations and Compliance. This administrative review and past ARB decisions do not establish policy or supersede federal law or regulations, it is limited to whether the Retailer Operations Division appropriately followed the Food and Nutrition Act of 2008, as amended, and the regulations and agency policy promulgated under the act.  Therefore, any application or reference to a supposed judicial precedent would best be addressed in a judicial review.

Based on this empirical data, and in the absence of sufficient evidence as to the legitimacy of such transactions, a conclusion can be drawn, through a preponderance of evidence that the "unusual, irregular, and inexplicable" transactions and patterns cited in the charge letter evidence trafficking as the most likely explanation.  In this case, ownership did not provide sufficient evidence to legitimize Appellant's transaction data as outlined in the Attachments.  Retailer Operations Division determined that Appellant's contentions did not outweigh the evidence that the store was trafficking and concluded, through a preponderance of evidence, that trafficking is the most probable explanation for the questionable transactions listed in the charge letter attachments.

It is noted that neither the poverty rate nor economic impact of losing SNAP authorization provide any evidence to support the unusual transaction patterns noted in the charge letter.  The transaction data and overall firm record convincingly demonstrate repetitive patterns of unusual, irregular, and inexplicable SNAP activity for this type of firm indicative of trafficking.  Once Retailer Operations Division established a convincing case against Appellant, ownership bears the burden of proving, by a preponderance of the evidence, that the administrative action should be reversed.  That means the Appellant has the burden of providing relevant evidence which a reasonable mind, considering the record as a whole, would accept as sufficient to support a conclusion that the matter asserted is more likely to be true than not true.  If this is not demonstrated, the case is to be sustained.

As noted, 7 CFR § 278.6(a) states that FNS may disqualify any authorized retail food store if the firm fails to comply with the Food and Nutrition Act of 1977, as amended, or this part.  Such disqualification shall result from a finding of a violation on the basis of evidence that may include facts established through inconsistent redemption data, and evidence obtained through a transaction report under an electronic benefit transfer system.

Retailer Operations Division has presented a convincing case that Appellant has likely trafficked in SNAP benefits.  This is evidenced by:  the suspicious patterns in two attachments of EBT transaction data, the inadequacy of the firm's eligible food stock as observed and recording during the onsite visit to support the transaction patterns, the lack of explanation for customer spending habits given that there are other SNAP authorized stores located within proximity to Appellant, and the irregular SNAP transaction data of Appellant as compared to other convenience stores in the State.

In the absence of evidence for the legitimacy for such transaction patterns based on information submitted by Appellant and a comparison of the store's characteristics and available stock to the transaction patterns cited in the charge letter, a conclusion can be drawn through a preponderance of evidence that the unusual, irregular, and inexplicable transactions and patterns

evidence trafficking as the most likely explanation. While ownership was afforded the opportunity to provide valid explanations and evidence that support that the questionable transactions were the result of legitimate purchases of eligible food items, Retailer Operations Division determined that Appellant's contentions did not outweigh the evidence in the record.

The purpose of the administrative review process is to ensure that firms aggrieved by Retailer Operations Division' adverse actions have the opportunity to have their position fairly considered by an impartial review authority prior to that adverse action becoming final. Appellant has been duly given and has taken the opportunity to present to USDA through the administrative review process whatever evidence and information it deems pertinent in support of its position that Retailer Operations Division' adverse action should be reversed. Therefore, any evidence and information that Appellant presented to Retailer Operations Division, as well as any such information submitted subsequently, have now been considered in this administrative review in rendering the final agency administrative decision in this case. The record does not indicate any departure from established policy or procedures with regard to Appellant's right to a fair and thorough review.

## CIVIL MONEY PENALTY

Appellant was notified in the charge letter dated July 10, 2017, that it had 10 calendar days upon receipt of the charge letter to provide required documentation in order to be considered for the trafficking CMP. Appellant failed to provide Retailer Operations Division with the required documentation to be considered for a trafficking CMP in lieu of disqualification. Therefore, Retailer Operations Division correctly determined that Appellant was not eligible for a trafficking CMP as set forth in the SNAP regulations.

## CONCLUSION

Ownership has not provided sufficient evidence to rebut the case that Appellant most likely trafficked in SNAP benefits. As such, the SNAP regulations are specific with regard to the action that must be taken if personnel of the firm have trafficked, which is that FNS shall disqualify the firm permanently.

Retailer Operations Division' analysis of Appellant's EBT transaction record was the primary basis for its determination to permanently disqualify Los Amigos Market from participation in the SNAP. This data provided substantial evidence that the questionable transactions during the review period had characteristics that are consistent with trafficking in SNAP benefits. Therefore, based on a review of all the evidence in this case, it is more likely true than not true that program violations did, in fact, occur as charged by Retailer Operations Division. Based on the discussion herein, the determination to impose a permanent disqualification against Los Amigos Market is sustained.

## RIGHTS AND REMEDIES

Your attention is called to Section 14 of the Food and Nutrition Act of 1977, as amended, (7 U.S.C. § 2023) and to Title 7, Code of Federal Regulations, Part 279.7 (7 CFR § 279.7) with

respect to your right to a judicial review of this determination.  Please note that if a judicial review is desired, the Complaint, naming the United States as the defendant, must be filed in the U.S. District Court for the district in which you reside or are engaged in business, or in any court of record of the State having competent jurisdiction.  If any Complaint is filed, it must be filed within thirty (30) days of receipt of this Decision.

Under the Freedom of Information Act (FOIA), we are releasing this information in a redacted format as appropriate.  FNS will protect, to the extent provided by law, personal information that could constitute an unwarranted invasion of privacy.


Monique Brooks                                                                      July 21, 2021
ADMINISTRATIVE REVIEW OFFICER